1
2
3
4
5
6
7

8                UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                 SAN JOSE DIVISION

| | |
|---|---|
| DAVID TOMPKINS, an individual, on behalf of himself and others similarly situated, )<br><br>               Plaintiffs, )<br>    v. )<br><br>23ANDME, INC., )<br><br>            Defendant. )<br>————————————————— ) | Case No.:  5:13-CV-05682-LHK<br><br>Consolidated and Related Cases:<br>      5:14-CV-00294-LHK<br>      5:14-CV-00429-LHK<br>      5:14-CV-01167-LHK<br>      5:14-CV-01191-LHK<br>      5:14-CV-01258-LHK<br>      5:14-CV-01348-LHK<br>      5:14-CV-01455-LHK<br><br>ORDER GRANTING OMNIBUS<br>MOTION TO COMPEL ARBITRATION |

       This case involves putative class action claims related to Defendant 23andMe, Inc.'s ("23andMe") advertising and marketing of its Personal Genome Service.  23andMe filed an Omnibus Motion to Compel Arbitration and to Dismiss or Alternatively Stay the Action in Favor of Arbitration.  ECF Nos. 69, 69-1 ("Mot.").  Plaintiffs oppose the Motion.  ECF No. 103 ("Opp'n").  23andMe filed a Reply in support of the Motion.  ECF No. 104 ("Reply").

       Having considered the parties' arguments, the Court found this matter appropriate for resolution without a hearing pursuant to Civil Local Rule 7-1(b).  Because the Court determines that Plaintiffs' claims must be arbitrated, the Court hereby GRANTS 23andMe's motion to compel arbitration and DISMISSES all of Plaintiffs' claims without prejudice.

# I.   BACKGROUND

## A.   Factual Allegations

### 1.   Personal Genome Service ("PGS") and the FDA Warning Letter

23andMe is a personal genetics company founded in 2006 that offers to provide customers hereditary information from a genetic sample.  *See* ECF No. 23-1.  The product at issue in the instant case is 23andMe's Personal Genome Service ("PGS").  PGS is a service that consists of a DNA saliva collection kit ("DNA kit") and DNA test results with certain genetic information derived from a customer's saliva sample.  To use PGS, customers first purchase DNA kits online at 23andMe's website, http://www.23andMe.com.[1]  The price of a DNA kit is currently $99, not including shipping fees.  Upon purchase, 23andMe ships the DNA kit to the customer with a pre-addressed return box and instructions on how to return a saliva sample to 23andMe.  *Id.*  23andMe then receives the saliva sample and has the DNA tested at a certified laboratory.  When 23andMe receives the DNA results from the laboratory, 23andMe posts the customer's DNA information online to the customer's personal genome profile.  The customer receives an e-mail notification when DNA results are ready to view.  *Id.*

The DNA results from PGS have had two components: the health component and the ancestry component.  ECF No. 23-8.  The health component informs customers about how their genetics impact their health by providing data on health risks, inherited conditions, drug responses, and genetic traits.  *Id.*  The ancestry component offers a variety of features such as tracing ancestry and identifying relatives, including a DNA comparison to other 23andMe users.  *Id.*

---

[1]      The parties do not dispute that the key portions of the website have not changed since the relevant times when Plaintiffs allegedly performed the transactions at issue.  23andMe relies on excerpts from a February 2014 version of the website (*see* ECF No. 70-9), while Plaintiffs use excerpts dated April 2014 (*see* ECF No. 103-2).  However, the Court takes judicial notice of the Internet Archive (http://archive.org) version of 23andMe's website as of November 20, 2013, the full version of the website archived right before the FDA warning letter of November 22, 2013 (discussed below).  The Court applies the doctrine of incorporation by reference to the instant case. *See Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) ("[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss."); *see also Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (taking judicial notice of linked webpages because "a computer user necessarily views web pages in the context of the links through which the user accessed those pages").

2

1    On November 22, 2013, the Food and Drug Administration ("FDA") sent a "Warning

2  Letter" to 23andMe.  ECF No. 103-2.  The letter informed 23andMe that the company was

3  violating the Food, Drug and Cosmetic Act by selling PGS without marketing clearance or

4  approval.  The FDA detailed a number of concerns with the health component of PGS.  The letter

5  further noted that 23andMe had expanded the uses of PGS beyond those submitted to the FDA and

6  broadened its marketing campaigns without FDA authorization.  *Id.*  The FDA required 23andMe

7  to discontinue marketing PGS until 23andMe received marketing clearance and approval for the

8  product.  *Id.*  On December 6, 2013, 23andMe stopped offering the health component of PGS to

9  new customers.  *See* Tompkins Compl. (ECF No. 1) ¶ 1.  The FDA allowed 23andMe to continue

10  to provide new customers with the ancestry component of PGS in addition to raw genetic data.  *See*

11  Mot. at 2.  Customers who purchased PGS before November 22, 2013 could receive their initial

12  health results without updates.  *Id.* at 3.  According to the company's website, 23andMe now

13  provides full refunds to anyone who purchased a DNA kit between November 22, 2013 and

14  December 5, 2013.

15                    **2.      23andMe's Terms of Service**

16    The present dispute about arbitration of the Plaintiffs' claims turns on a purported

17  agreement between the parties.  The last section of 23andMe's online Terms of Service ("TOS") is

18  a "Miscellaneous" section numbered 28.  Section 28b of this Miscellaneous section is an arbitration

19  provision that reads as follows:

20           **Applicable law and arbitration.** Except for any disputes relating to intellectual
          property rights, obligations, or any infringement claims, any disputes with 23andMe
21           arising out of or relating to the Agreement ("**Disputes**") shall be governed by
          California law regardless of your country of origin or where you access 23andMe,
22           and notwithstanding of any conflicts of law principles and the United Nations
          Convention for the International Sale of Goods. Any Disputes shall be resolved by
23           final and binding arbitration under the rules and auspices of the American
          Arbitration Association, to be held in San Francisco, California, in English, with a
24           written decision stating legal reasoning issued by the arbitrator(s) at either party's
          request, and with arbitration costs and reasonable documented attorneys' costs of
25           both parties to be borne by the party that ultimately loses. Either party may obtain
          injunctive relief (preliminary or permanent) and orders to compel arbitration or
26           enforce arbitral awards in any court of competent jurisdiction.

27  ECF No. 70-10 § 28b (the "arbitration provision").  At all relevant times, the TOS have been

28  accessible via hyperlink at the bottom of 23andMe's homepage under the heading "LEGAL."  ECF

**United States District Court**
For the Northern District of California

3

No. 22-3.  The user must scroll through a significant amount of information to view the TOS hyperlink at the bottom of the homepage.  Other pages such as "Refund Policy" and "Privacy Policy" also include the TOS hyperlink, but reference to the TOS never appears in the text, sidebar, or at the top of the webpage prior to purchase of a DNA kit.  The TOS hyperlink appears at the bottom of many, but not all, of 23andMe's website pages.  The words always appear in standard font size, in blue or gray font, on a white background.

When customers buy and obtain PGS, they perform two steps on 23andMe's website.  First, a customer must order and pay for a DNA kit.  The ordering webpage has no requirement that customers view the TOS or click to accept the TOS.  In other words, customers can enter their payment information and purchase DNA kits online without seeing the TOS.  *See* Opp'n at 4.  The only opportunity for a full refund is a 60-minute cancellation window after purchase.  *See* ECF 103-2 Ex. 4 ("The cancellation option is available for 60 minutes after you place your order from both the order confirmation page and the order confirmation email.").  Customers can receive partial refunds within 30 days of purchase, provided they have not already sent their saliva to the laboratory.  *Id.*  Customers have 12 months from the date of purchase to use the DNA kit.

Second, after purchase of a DNA kit, in order to send in a DNA sample to the laboratory and receive genetic information, customers must both create accounts and register their DNA kits online.  *See* Hillyer Decl. (ECF No. 71) ¶ 3.  The account creation page requires customers to check a box next to the line, "Yes, I have read and agree to the Terms of Service and Privacy Statement."  The TOS and Privacy Statement appear in blue font and are hyperlinks to the full terms:



Hillyer Decl. ¶ 4, Ex. A.

Similarly, during the registration process, customers must view a page with the title "To continue, accept our terms of service" written in large font at the top of the page.  The registration

4

page provides a hyperlink to the full TOS next to the line: "When you sign up for 23andMe's service you agree to our Terms of Service. Click <u>here</u> to read our full Terms of Service." Customers must then click a large blue icon that reads "I ACCEPT THE TERMS OF SERVICE" before finishing the registration process and receiving their DNA information:



Hillyer Decl. ¶ 5, Ex. B.  As explained below, all named Plaintiffs in the instant action created accounts and registered their DNA kits online.  *See* ECF No. 105 ¶ 2.  However, it is possible for a customer to buy a DNA kit, for example, as a gift for someone else, so that the purchasing customer never needs to create an account or register the kit, and thus is never asked to acknowledge the TOS.

**B.      Procedural History**

Following the FDA letter, between November 27, 2013 and March 27, 2014, multiple Plaintiffs filed class action complaints against 23andMe across several venues, alleging a variety of claims related to false advertising, unfair competition, and consumer protection.  All pending litigations in federal district courts have been transferred to this Court and consolidated for pretrial purposes.  *See* ECF Nos. 28, 33, 45 (orders consolidating cases).  Additionally, according to the parties, there are at least three arbitrations pending before the American Arbitration Association ("AAA") involving class claims.  *See* ECF No. 53 at 8 (listing proceedings); Mot. at 4.

On February 25, 2014, in the case involving Plaintiff David Tompkins (No. 13-CV-05682), 23andMe moved to compel arbitration.  ECF No. 20.  The parties agreed to postpone briefing and

1    resolution of that motion pending transfer and consolidation of the other co-pending litigations.

2    ECF No. 25.  23andMe subsequently withdrew its initial motion regarding arbitration and, on April

3    28, 2014, filed the current "omnibus" motion to compel all Plaintiffs to arbitrate all claims.  ECF

4    No. 69.  On May 28, 2014, Plaintiffs filed an Opposition.  ECF No. 103.  On June 4, 2014,

5    23andMe filed a reply.  ECF No. 104.  Additionally, following briefing and argument, the Court

6    appointed interim class counsel on May 14, 2014.  ECF No. 100.

7    **II.     LEGAL STANDARDS**

8         **A.     Federal Arbitration Act**

9         The Federal Arbitration Act ("FAA") applies to arbitration agreements in any contract

10   affecting interstate commerce.  *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001); 9

11   U.S.C. § 2.  Enacted for the purpose of making valid and enforceable written agreements to

12   arbitrate disputes, the FAA embodies "the basic precept that arbitration 'is a matter of consent, not

13   coercion.'"  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1773 (2010) (quoting

14   *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)).  In

15   accordance with this principle, the Supreme Court has held that parties may agree to limit the

16   issues subject to arbitration, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S.

17   614, 628 (1985); to arbitrate according to specific rules, *Volt*, 489 U.S. at 479; and to limit with

18   whom a party will arbitrate its disputes, *Stolt-Nielsen*, 130 S. Ct. at 1773.  Section 4 of the FAA

19   ensures that "'private agreements to arbitrate are enforced according to their terms,'" *id.* (quoting

20   *Volt*, 489 U.S. at 479), by expressly authorizing a party to an arbitration agreement to petition a

21   U.S. District Court for an order directing that "arbitration proceed in the manner provided for in

22   such agreement," 9 U.S.C. § 4.  In addition, the FAA contains a mandatory stay provision.  *Id.* § 3.

23        Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable save

24   upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

25   Arbitration is a matter of contract, and the FAA places arbitration agreements "on an equal footing

26   with other contracts."  *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010).  The

27   interpretation of an arbitration agreement is therefore generally a matter of state law, *see Arthur

28   Andersen LLP v. Carlisle*, 129 S. Ct. 1896, 1901-02 (2009), unless application of state-law rules

*United States District Court*
For the Northern District of California

6

1    would "stand as an obstacle to the accomplishment of the FAA's objectives," *AT&T Mobility LLC*

2    *v. Concepcion*, 131 S. Ct. 1740, 1748 (2011).

3        **B.    Arbitrability**

4        Parties can agree to delegate arbitrability—or "gateway" issues concerning the scope and

5    enforceability of the arbitration agreement, and whether the dispute should go to arbitration at all—

6    to the arbitrator.  The Supreme Court has held that the question of "who has the power to decide

7    arbitrability," the court or the arbitrator, "turns upon what the parties agreed about *that* matter."

8    *First Options of Chicago v. Kaplan*, 514 U.S. 938, 943 (1995) (emphasis in original).  "An

9    agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party

10   seeking arbitration asks the federal court to enforce, and the FAA operates on this additional

11   arbitration agreement just as it does on any other."  *Rent-A-Center*, 561 U.S. at 70.  The Supreme

12   Court recognizes a heightened standard for an arbitrator to decide arbitrability issues.  *See AT&T*

13   *Techs. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and

14   unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be

15   decided by the court, not the arbitrator."); *Kaplan*, 514 U.S. at 944 ("Courts should not assume that

16   the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that

17   they did so.").  *Rent-A-Center* acknowledges that while courts may consider enforceability

18   challenges that are specific to the delegation clause in an arbitration agreement, the arbitrator is to

19   consider challenges to the arbitration agreement as a whole.  561 U.S. at 73.  In cases where the

20   parties "clearly and unmistakably intend to delegate the power to decide arbitrability to an

21   arbitrator," the Court's inquiry is "limited . . . [to] whether the assertion of arbitrability is 'wholly

22   groundless.'"  *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1371 (Fed. Cir. 2006) (applying

23   Ninth Circuit law).

24       **C.    Unconscionability**

25       When evaluating defenses to arbitration agreements, such as unconscionability, courts

26   generally apply state contract law.  *See Arthur Andersen*, 129 S. Ct. at 1901-02; 9 U.S.C. § 2.  In

27   this case, California law governs 23andMe's arbitration agreement.  *See TOS § 28b* ("any disputes

28   . . . shall be governed by California law").  Under California law, "unconscionability has both a

United States District Court
For the Northern District of California

'procedural' and a 'substantive' element." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000) (citation omitted).  California courts have explained the interplay between procedural and substantive unconscionability as follows:

> The procedural component focuses on the factors of oppression and surprise. Oppression results where there is no real negotiation of contract terms because of unequal bargaining power.  "Surprise" involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms.  The substantive component of unconscionability looks to whether the contract allocates the risks of the bargain in an objectively unreasonable or unexpected manner.  To be unenforceable there must be both substantive and procedural unconscionability, though there may be an inverse relation between the two elements.

*Patterson v. ITT Consumer Fin. Corp.*, 14 Cal. App. 4th 1659, 1664 (1993) (citations omitted).

## III.    DISCUSSION

The parties dispute several issues regarding the TOS.  The Court addresses these in turn, starting with whether a contract between the parties exists at all.

### A.    Existence of Agreement

Plaintiffs contend that there is no valid arbitration agreement because (1) they did not agree to the TOS when they purchased the DNA kits, and (2) they received no consideration for agreeing to the TOS when they subsequently created accounts or registered their kits.  *See* Opp'n at 14-16. 23andMe responds that the TOS are valid and enforceable clickwrap agreements that each named Plaintiff accepted by clicking a box or button on the website.  *See* Reply at 13-15.  The Court agrees with Plaintiffs that they did not agree to the TOS at the purchasing stage, but agrees with 23andMe that the TOS took effect upon account creation and/or registration.

#### 1.    Agreement Upon Purchase

Plaintiffs first argue that they never agreed to the TOS when they purchased PGS.  As explained above, Plaintiffs' reference to the "PGS" conflates two items: the physical DNA kits and the subsequent provision of genetic information.  Customers perform a bifurcated transaction in which they purchase the DNA kit online, and then obtain hereditary data after creating an account, registering the kit, and submitting a saliva sample.  Here, Plaintiffs contend that 23andMe did not provide the TOS "as part of the checkout process" (Opp'n at 16), which implicates the step of buying the DNA kits.  The Court agrees that the TOS were not effective upon purchase of the kits.

8

1    The existence of an agreement between 23andMe and its customers implicates the law of

2    Internet-based contract formation.  An increasing number of courts and commentators have

3    addressed the circumstances under which parties may form contracts online.  In particular,

4    "shrinkwrap," "clickwrap," and "browsewrap" agreements are relevant here.  A shrinkwrap

5    agreement generally refers to a situation where a customer buys and receives a product, the written

6    agreement is presented with the product after purchase, and the customer implicitly accepts by

7    opening and keeping the product.  *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 32 (2d

8    Cir. 2002).  A clickwrap agreement "presents the user with a message on his or her computer

9    screen, requiring that the user manifest his or her assent to the terms of the license agreement by

10   clicking on an icon."  *Id.* at 22 n.4 (quotation and citation omitted).  By contrast, as this Court

11   recently explained:

12   > Browsewrap agreements are those that purport to bind the users of websites to
     > which the agreements are hyperlinked. Generally, the text of the agreement is found
13   > on a separate webpage hyperlinked to the website the user is accessing. The
     > browsewrap agreements are generally entitled "Terms of Use" or "Terms of
14   > Service." The defining feature of browsewrap agreements is that the user can
     > continue to use the website or its services without visiting the page hosting the
15   > browsewrap agreement or even knowing that such a webpage exists.

16   *Be In, Inc. v. Google Inc.*, No. 12-CV-03373-LHK, 2013 U.S. Dist. LEXIS 147047, at *23 (N.D.

17   Cal. Oct. 9, 2013).  Courts have enforced certain clickwrap and browsewrap agreements,

18   depending on the nature of the parties, type of notice provided, and other factors.  *See generally*

19   Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 459-60 (2006).  In general, courts enforce

20   inconspicuous browsewrap agreements only when there is evidence that the user has actual or

21   constructive notice of the site's terms.  *See Sw. Airlines Co. v. BoardFirst, L.L.C.*, No. 3:06-CV-

22   0891-B, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007); *see also* Lemley, *supra*, at 477 ("Courts

23   may be willing to overlook the utter absence of assent only when there are reasons to believe that

24   the defendant is aware of the plaintiff's terms.").

25   Here, at the purchase stage, the TOS on 23andMe's website closely resembled a

26   browsewrap agreement and provided insufficient notice to customers who bought DNA kits.  There

27   is no dispute that 23andMe's website did not require customers to acknowledge the TOS during

28   purchase.  23andMe does not specifically argue that Plaintiffs accepted the TOS upon purchasing

9

the kits, but does argue that it was "impossible to register for and receive the Service without

clicking **'I ACCEPT'** to the TOS."  Reply at 15.  However, 23andMe uses the term "Service"

ambiguously in its briefs and in the TOS.  The TOS provides the following definition:

> "Service" or "Services" means 23andMe's *products*, software, services, *and website*
> (including but not limited to text, graphics, images, and other material and
> information) as accessed from time to time by the user, *regardless if the use is in
> connection with an account or not.*

TOS § 1 (emphases added).  The TOS also states: "You can accept the TOS by . . . *actually using

the Services*."  *Id.* § 2 (emphasis added).  Thus, according to the plain language of the TOS, a

customer accepted the terms merely by using a product (such as the DNA kit) or visiting the

website, even without creating an account.  As a result, 23andMe's contention in its Reply that it

was "impossible to . . . receive *the Service* without clicking **'I ACCEPT'**" (italics added) is

misleading.

23andMe cannot rely on purported acceptance of the TOS upon purchase to demonstrate a

valid agreement.  As explained above, during checkout, the website did not present or require

acceptance of the TOS.  Rather, the only way for a customer to see the TOS at that stage was to

scroll to the very bottom of the page and click a link under the heading "LEGAL."  *See* Hillyer

Decl. ¶ 6, Ex. C.  Such an arrangement provided insufficient notice to customers and website

visitors.  For example, in *Be In*, this Court held that "mere use of a website" could not demonstrate

users' assent, and that the "mere existence of a link" failed to notify users of terms of service.

2013 U.S. Dist. LEXIS 147047, at *33.  Other courts have held that similar browsewrap-style

agreements are ineffective.  *E.g.*, *Specht*, 306 F.3d at 20, 32 (finding that a "reasonably prudent

Internet user" would not have seen "a reference to the existence of license terms on a submerged

screen"); *Jerez v. JD Closeouts, LLC*, 943 N.Y.S.2d 392, 398 (Dist. Ct. 2012) ("[E]-commerce

merchants cannot blithely assume that the inclusion of sale terms, listed somewhere on a

hyperlinked page on its website, will be deemed part of any contract of sale."); *Hines v.

Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) *aff'd*, 380 F. App'x 22 (2d Cir.

2010) (holding online retail store did not provide adequate notice when the website did not prompt

customer to review the site's "Terms and Conditions" and the link to the terms was not

Case No.: 13-CV-05682-LHK
ORDER GRANTING OMNIBUS MOTION TO COMPEL ARBITRATION

prominently displayed).  23andMe's customers may have been unfamiliar with the website, and the website's layout never directed customers to view the TOS prior to purchase.  Thus there is no evidence that Plaintiffs had or should have had knowledge of the TOS when they purchased their DNA kits online.

Accordingly, 23andMe's TOS would have been ineffective to bind website visitors or customers who only purchased a DNA kit without creating an account or registering a kit.  The Court finds that 23andMe's practice of obscuring terms of service until after purchase—and for a potentially indefinite time—is unfair, and that a better practice would be to show or require acknowledgement of such terms at the point of sale.

### 2.  Post-Purchase Agreement

Plaintiffs next argue that any acceptance of the TOS after the purchasing stage was also ineffective for multiple reasons.  The Court addresses each of these arguments.

Initially, Plaintiffs imply that none of the named Plaintiffs ever clicked "I ACCEPT" to the TOS, claiming that "23andMe has not submitted competent evidence that plaintiffs ever agreed to the Terms of Service."  Opp'n at 16.  This argument is unavailing.  Plaintiffs rely on *Comb v. PayPal, Inc.*, but in that case, the parties disputed whether the relevant agreement contained an arbitration provision at certain times, which is not at issue here.  218 F. Supp. 2d 1165, 1171-72 (N.D. Cal. 2002).  Plaintiffs do not dispute that the 23andMe website requires each person who creates an account or registers a kit to indicate acceptance of the TOS before receiving any test results, nor do Plaintiffs dispute that the TOS contained the same arbitration provision at all relevant times.  Various Plaintiffs have alleged that they received test results after purchasing kits.  *See, e.g.*, Tompkins Compl. ¶ 15; Dilger Decl. (ECF No. 103-3) ¶¶ 5-6.  Thus, these Plaintiffs must have clicked "I ACCEPT THE TERMS OF SERVICE" when creating an account and registering.  Plaintiffs also submit a declaration from named Plaintiff Vernon Stanton stating that he in fact agreed to the TOS.  *See* Stanton Decl. (ECF No. 103-4) ¶¶ 4-5.  Moreover, 23andMe has submitted records with its Reply showing that each named Plaintiff created an account and registered a kit.  *See* Hillyer Supp. Decl. (ECF No. 105) ¶ 2, Exs. A-M; Reply at 14 n.20.  Other courts have found that user access to portions of websites that require indicating assent to be sufficient evidence that

Case No.: 13-CV-05682-LHK
ORDER GRANTING OMNIBUS MOTION TO COMPEL ARBITRATION

the user clicked "I Accept."  *See Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 237 (E.D. Pa. 2007) ("Clicking 'Continue' without clicking the 'Yes' button would have returned the user to the same webpage. If the user did not agree to all of the terms, he could not have activated his account, placed ads, or incurred charges.").  Thus, Plaintiffs cannot credibly claim ignorance as to whether they actually clicked the appropriate checkboxes.

Next, Plaintiffs argue that any post-purchase acceptance of the TOS (during account creation or registration) was ineffective because customers had by then already paid for the DNA kits and received no additional consideration for accepting the TOS.  *See* Opp'n at 17.  Plaintiffs contend that the TOS was either a clickwrap agreement that lacked adequate consideration, or a shrinkwrap agreement that provided "no adequate right to return the product."  *Id.*  23andMe responds that customers received adequate consideration in the form of 23andMe's agreement to arbitrate and certain intellectual property concessions.  *See* Reply at 14-15.  The parties also disagree as to whether post-purchase agreement to the TOS constituted a clickwrap or browsewrap agreement, as courts have tended to enforce the former but not the latter.  *Compare* Opp'n at 17 *with* Reply at 15; *see also* Lemley, *supra*, at 459-60.

The Court concludes that there was adequate consideration for customers' acceptance of the TOS post-purchase.  Under California contract law (which governs under the TOS and is not disputed by the parties), "[a] written instrument is presumptive evidence of a consideration," Cal. Civ. Code § 1614, and "all the law requires for sufficient consideration is the proverbial 'peppercorn,'" *San Diego City Firefighters, Local 145 v. Bd. of Admin.*, 206 Cal. App. 4th 594, 619 (2012).  The Ninth Circuit has held, in the employment context and under California law, that a "promise to be bound by the arbitration process itself serves as adequate consideration." *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002).  Under this precedent, 23andMe's agreement to accept arbitration provided acceptable consideration to its customers.  The TOS also provided certain rights to customers, such as a "limited license" to use 23andMe's "Services" as defined in the agreement.  *See* TOS ¶ 9.  Furthermore, in exchange for clicking "I ACCEPT," customers received the health and ancestry results from their DNA samples.  Accordingly, Plaintiffs received sufficient consideration for agreeing to the TOS.

Case No.: 13-CV-05682-LHK
ORDER GRANTING OMNIBUS MOTION TO COMPEL ARBITRATION

The Court also determines that Plaintiffs received adequate notice regarding the TOS.  As noted above, during the account creation and registration processes, each named Plaintiff clicked a box or button that appeared near a hyperlink to the TOS to indicate acceptance of the TOS.  In this respect, the TOS resemble clickwrap agreements, where an offeree receives an opportunity to review terms and conditions and must affirmatively indicate assent.  *See Specht*, 306 F.3d at 22 n.4.  The fact that the TOS were hyperlinked and not presented on the same screen does not mean that customers lacked adequate notice.  For example, in *Fteja v. Facebook, Inc.*, the court dealt with a similar website agreement that required users to click "Sign Up" and presented only a link to the relevant terms and conditions.  841 F. Supp. 2d 829, 834-35 (S.D.N.Y. 2012).  The court noted that the agreement possessed characteristics of both clickwrap and browsewrap agreements: "Thus Facebook's Terms of Use are somewhat like a browsewrap agreement in that the terms are only visible via a hyperlink, but also somewhat like a clickwrap agreement in that the user must do something else—click 'Sign Up'—to assent to the hyperlinked terms.  Yet, unlike some clickwrap agreements, the user can click to assent whether or not the user has been presented with the terms." *Id.* at 838.  Nevertheless, *Fteja* concluded that the website provided adequate notice because courts have long upheld contracts where "the consumer is prompted to examine terms of sale that are located somewhere else."  *Id.* at 839; *see also Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011) (enforcing arbitration clause where "Plaintiff was provided with an opportunity to review the terms of service in the form of a hyperlink immediately under the 'I accept' button").

Plaintiffs' analogy to a typical shrinkwrap agreement—and a supposed requirement to provide a full refund—is misplaced here.  Plaintiffs argue that the TOS resemble a shrinkwrap agreement because the customer received terms only after paying for the product.  In *ProCD, Inc. v. Zeidenberg*, one of the seminal cases on shrinkwrap contracts, the Seventh Circuit upheld such contracts in part because the customers there had "a right to return the software for a refund if the terms are unacceptable."  86 F.3d 1447, 1451 (7th Cir. 1996).  Here, 23andMe's Refund Policy was restrictive: customers could "cancel" (receive a full refund) only within 60 minutes of purchasing a DNA kit, and could obtain a partial refund "subtracting a) $25 per kit and b) your original shipping

Case No.: 13-CV-05682-LHK
ORDER GRANTING OMNIBUS MOTION TO COMPEL ARBITRATION

and handling charges" only within 30 days of purchase and before the laboratory received a DNA sample. ECF No. 103-2 Ex. 4. However, the shrinkwrap analogy does not apply here because 23andMe does not argue that the TOS took effect when customers failed to return the DNA kits after a certain period. In typical shrinkwrap cases, the customer tacitly accepts contractual terms by not returning the product within a specified time. *E.g.*, *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997) (upholding contract that became effective when customer did not return product within 30 days). In this case, each named Plaintiff actually agreed to the TOS by affirming "I ACCEPT THE TERMS OF SERVICE," not by keeping the DNA kit beyond a certain time.[2] Thus, Plaintiffs' argument that 23andMe's refund policy was too restrictive does not negate their affirmative assent to the TOS. Certain named Plaintiffs claim not to remember seeing the TOS or Section 28b (the arbitration agreement). *See* Stanton Decl. ¶¶ 5-6; Dilger Decl. ¶¶ 5-6. Even if true, that does not change the fact that they received adequate notice of the relevant terms and clicked the "I ACCEPT THE TERMS OF SERVICE" button. *See, e.g.*, *Merkin v. Vonage Am. Inc.*, No. 2:13-cv-08026, 2014 U.S. Dist. LEXIS 14055, at *8 (C.D. Cal. Feb. 3, 2014) ("But plaintiffs' failure of recollection as to whether or not they agreed to the TOS does not create a genuine dispute in light of Vonage's evidence that agreeing to the TOS is required during the registration process."). Furthermore, California contract law is clear that "[a] party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing." *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049 (2001).

For the reasons above, the Court concludes that the named Plaintiffs accepted the TOS when they created accounts or registered their DNA kits, and rejects Plaintiffs' argument that no arbitration agreements exist with 23andMe.

**B.      Arbitrability**

Plaintiffs argue that the arbitration provision in the TOS is unconscionable and cannot be enforced. However, 23andMe contends that this Court cannot decide unconscionability because

---

[2]      The result may differ for putative unnamed plaintiffs who only purchased a DNA kit without creating an account or registering the product. As noted above, any such customers were not required to accept the TOS, and did not otherwise receive adequate notice of the TOS, before giving 23andMe their money.

14

the arbitration provision delegates those issues to an arbitrator, such that questions of arbitrability must themselves be arbitrated. *See* Mot. at 1-6. The Court concludes that the arbitration provision fails to show that the parties clearly and unmistakably consented to delegate arbitrability, and that the Court must decide Plaintiffs' unconscionability defense.

### 1. Applicable Law

The parties dispute even the threshold question of what law applies to determine if questions of arbitrability must go to a court or an arbitrator. Plaintiffs' position is that California law applies to this issue because the arbitration provision says that "any disputes with 23andMe arising out of or relating to the Agreement (**"Disputes"**) shall be governed by California law." *See* Opp'n at 6 (emphasis in original). 23andMe responds that federal law applies because federal courts have resolved the issue of delegation of arbitrability without expressly relying on state law. *See* Reply at 1-2.

The Court concludes that the federal law of arbitrability applies in these circumstances. Interpretation of arbitration agreements generally turns on state law. *See Arthur Andersen*, 129 S. Ct. at 1901-02. However, the U.S. Supreme Court has held that "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute," and that "[t]he court is to make this determination by applying the federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Mitsubishi*, 473 U.S. at 626. In the Ninth Circuit, parties may agree "to have arbitrability governed by non-federal arbitration law," but this requires "clear and unmistakable evidence" of the parties' intent to do so. *Cape Flattery Ltd. v. Titan Maritime*, 647 F.3d 914, 921 (9th Cir. 2011) ("Courts should apply federal arbitrability law absent 'clear and unmistakable evidence' that the parties agreed to apply non-federal arbitrability law.").

In this case, federal arbitrability law applies presumptively because the parties agree that the FAA covers the TOS arbitration provision. *See* 9 U.S.C. § 2 (FAA applies to "a contract evidencing a transaction involving commerce"). The TOS arbitration provision does not clearly and unmistakably show that California law of arbitrability should apply because it states only that disputes "arising out of or relating to the Agreement" are governed by California law. In *Cape*

15

United States District Court
For the Northern District of California

*Flattery*, the Ninth Circuit held that nearly identical language—a provision that "[a]ny dispute arising under this Agreement shall be settled by arbitration . . . in accordance with the English Arbitration Act 1996"—was "ambiguous concerning whether English law also applies to determine whether a given dispute is arbitrable in the first place." 647 F.3d at 921. By the same token, the 23andMe provision is similarly "ambiguous" because it does not expressly designate the law that governs arbitrability, and thus federal arbitrability law applies by default.[3]

### 2. Incorporation of AAA Rules

23andMe's primary argument is that any challenges to the validity of the TOS arbitration provision—including Plaintiffs' unconscionability theories—are questions that the parties delegated to an arbitrator, and not the courts. 23andMe bases this argument on the reference to the AAA rules in Section 28b (the arbitration provision) of the TOS.

The TOS arbitration provision refers to the "rules and auspices of the American Arbitration Association." TOS § 28b. However, there are multiple layers of ambiguity about which AAA rules govern. The AAA maintains multiple sets of rules for different types of disputes, such as commercial, consumer, and employment. *See* https://www.adr.org/aaa/faces/rules. Section 28b does not identify any of these specific rules. Even 23andMe's counsel is inconsistent about which AAA rules apply. In its opening brief, 23andMe takes the position that the AAA Commercial Arbitration Rules apply to Plaintiffs' claims. *See* Mot. at 7 n.4. However, in its Reply, 23andMe states that the Commercial Arbitration Rules would be "supplemented by the AAA's Supplementary Procedures for Consumer-Related Disputes." Reply at 3 n.4, 12.

The AAA rules themselves indicate that one or more sets of rules may apply, at the AAA's discretion. Rule R-1(a) of the AAA's Commercial Arbitration Rules and Mediation Procedures

---

[3]     Additionally, the recent decision in *Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231 (2014), suggests that arbitrability should be analyzed similarly under both California and federal law. The California Court of Appeal addressed the issue of delegating arbitrability to the court or an arbitrator, and the question of whether state or federal law applies to that issue. *Id.* at 239. The court stated that "the FAA's applicability is immaterial because our decision in this case would be the same under either the FAA or the CAA [California Arbitration Act]," and noted that California courts "have specifically looked to the FAA when considering delegation clauses and have long held that the rules governing these clauses are the same under both state and federal law." *Id.* at 239-40 (citations omitted).

Case No.: 13-CV-05682-LHK
ORDER GRANTING OMNIBUS MOTION TO COMPEL ARBITRATION

("Commercial Rules") states that the Commercial Rules apply when the parties refer generically to AAA rules but do not specify a particular ruleset:

> The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules.

AAA, "Commercial Arbitration Rules and Mediation Procedures" at 10 (effective Oct. 1, 2013), *available at:* http://go.adr.org/LP=307.  However, Rule C-1(a) of the AAA's Supplementary Procedures for the Resolution of Consumer-Related Disputes ("Consumer Rules") states that both the Commercial and Consumer Rules apply to "an agreement between a consumer and a business where the business has a standardized, systematic application of arbitration clauses with customers."  AAA, "Supplementary Procedures for the Resolution of Consumer-Related Disputes" at 8 (effective Mar. 1, 2013), *available at:* https://www.adr.org/aaa/faces/aoe/gc/consumer. However, Rule C-1(a) further states that "[t]he AAA will have the *discretion to apply or not to apply* the Supplementary Procedures."  *Id.* (emphasis added).  Accordingly, in the instant case, there are at least two ambiguities in the arbitration provision's reference to the AAA rules: lack of identification of specific AAA rules, and uncertainty as to whether the Consumer Rules apply in addition to the Commercial Rules.

Under the AAA's Commercial Rules, Rule R-7(a) states that the arbitrator decides questions of arbitrability: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  *Id.* at 13.  Based on these rules, 23andMe claims that the TOS require an arbitrator to decide arbitrability.

In recent years, case law has developed regarding how courts should determine if questions of arbitrability should go to an arbitrator.  The default rule is that courts adjudicate arbitrability: "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."  *AT&T Techs.*, 475 U.S. at 649. "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r]

17

Case No.: 13-CV-05682-LHK
ORDER GRANTING OMNIBUS MOTION TO COMPEL ARBITRATION

and unmistakabl[e]' evidence that they did so." *Kaplan*, 514 U.S. at 944 (citation omitted). However, parties can agree to arbitrate arbitrability through a so-called delegation provision in a contract. "The delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement." *Rent-A-Center*, 561 U.S. at 68.

More specifically, an arbitration agreement can incorporate a delegation provision by referencing separate arbitration rules that provide for delegation. Generally, when the contracting parties are commercial entities, incorporation of AAA rules in an arbitration agreement constitutes "clear and unmistakable evidence" that the parties intended to arbitrate arbitrability because—as explained above—Rule R-7(a) of the Commercial Arbitration Rules transfers that responsibility to the arbitrator. *E.g.*, *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005).

However, Plaintiffs advocate a different result in the consumer context. Plaintiffs contend that "nearly all" cases finding that an arbitrator must decide arbitrability as a result of the AAA rules "involve transactions between sophisticated commercial entities," while none involves "a consumer who has no understanding of the 'rules and auspices of the American Arbitration Association.'" Opp'n at 13-14. Plaintiffs also point out that the arbitration provision lacks an express delegation provision on its face, so a consumer would have to look up the AAA rules to find Rule R-7(a). *See id.* at 10. In response, 23andMe argues that there is no recognized exception for consumers. *See* Reply at 3.

In this case, the Court agrees with Plaintiffs that a bare reference to the AAA rules in 23andMe's online contract does not show that the parties clearly and unmistakably intended to delegate arbitrability. Less than a year ago, the Ninth Circuit indicated that the principle of incorporating a delegation provision by citing third-party arbitration rules may not apply to consumers. In *Oracle America, Inc. v. Myriad Group A.G.*, the Ninth Circuit addressed the question of whether incorporation of the UNCITRAL (United Nations Commission on International Trade Law) arbitration rules served to delegate arbitrability. 724 F.3d 1069 (9th Cir. 2013). Noting that this was "an issue of first impression in the Ninth Circuit," the court surveyed other Circuits' holdings regarding incorporation of both the UNCITRAL and AAA rules, and concluded that incorporation in the contract at issue was effective. *Id.* at 1073-75. However,

18

*Oracle* expressly limited its holding: "We hold that as long as an arbitration agreement is between sophisticated parties to commercial contracts, those parties shall be expected to understand that incorporation of the UNCITRAL rules delegates questions of arbitrability to the arbitrator." *Id.* at 1075.  Moreover, the court stated: "We express no view as to the effect of incorporating arbitration rules into consumer contracts." *Id.* at 1075 n.2.  Thus, the Ninth Circuit declined to hold that incorporation of arbitration rules shows "clear and unmistakable evidence" of an agreement to delegate arbitrability when consumers are involved.

There is good reason not to extend this doctrine from commercial contracts between sophisticated parties to online click-through agreements crafted for consumers.  While incorporation by reference is generally permissible under ordinary contract principles, *see Williams Constr. Co. v. Standard-Pacific Corp.*, 254 Cal. App. 2d 442, 454 (1967), incorporation of the AAA rules does not necessarily amount to "clear and unmistakable" evidence of delegation, particularly when the party asked to accept the agreement is a consumer.  Indeed, the Supreme Court held that by default, courts should decide arbitrability because the question of "who (primarily) should decide arbitrability" is "rather arcane," and "[a] party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers." *Kaplan*, 514 U.S. at 945.  The "clear and unmistakable" test thus established a "heightened standard" to evince delegation. *Rent-A-Center*, 561 U.S. at 69 n.1.[4]

The California Court of Appeal has expressed strong doubts about whether mere reference to AAA rules provides adequate notice to an individual employee: "In our view, while the incorporation of AAA rules into an agreement might be sufficient indication of the parties' intent in other contexts, we seriously question how it provides clear and unmistakable evidence that an employer and an employee intended to submit the issue of the unconscionability of the arbitration provision to the arbitrator, as opposed to the court." *Ajamian*, 203 Cal. App. 4th at 790.  Moreover,

---

[4]     The Supreme Court has not decided whether incorporation by reference of the AAA rules always meets this heightened standard.  In *Rent-A-Center*, the employment arbitration agreement contained an express delegation provision, and the parties did not dispute the existence of the delegation provision.  Therefore, *Rent-A-Center* did not address whether invocation of AAA rules effectively incorporates a delegation provision by reference, or whether such a provision would bind consumers.

Case No.: 13-CV-05682-LHK
ORDER GRANTING OMNIBUS MOTION TO COMPEL ARBITRATION

"[t]here are many reasons for stating that the arbitration will proceed by particular rules, and doing so does not indicate that the parties' motivation was to announce who would decide threshold issues of enforceability." *Id.*; *see also Patterson*, 14 Cal. App. 4th at 1666 ("While [the National Arbitration Forum]'s rules and fees might be fairly applied to business entities or sophisticated investors and to claims for substantial dollar amounts, those same procedures become oppressive when applied to unsophisticated borrowers of limited means in disputes over small claims."); *A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 489 (1982) (noting that businessmen generally have "substantially more economic muscle than the ordinary consumer"). Although California law regarding arbitrability does not control here, the Court finds this reasoning persuasive in the current context, particularly because California courts have indicated that California and federal arbitrability law are congruent. *See supra* n.3.

In other contexts, courts have required specificity when incorporating external arbitration rules to ensure adequate notice. For example, at least one other court in this district has refused to apply Rule R-7(a) in a case involving franchise agreements where the "agreements themselves do not quote this portion of Rule 7, nor do they even refer specifically to Rule 7." *Moody v. Metal Supermarket Franchising Am., Inc.*, No. 13-CV-5098-PJH, 2014 U.S. Dist. LEXIS 31440, at *10 (N.D. Cal. Mar. 10, 2014). The *Moody* Court determined that a reference to the "then current commercial arbitration rules of the AAA" was insufficient evidence of "clear and unmistakable" intent to delegate arbitrability, contrasting this language with an express delegation provision. *Id.* at *11.[5]

In addition, a generic reference to the AAA rules does not necessarily incorporate all *future* versions of the rules. In *Gilbert Street Developers, LLC v. La Quinta Homes, LLC*, the disputed arbitration agreement incorporated the AAA rules, but the AAA rule delegating arbitrability did not exist when the agreement was signed. 174 Cal. App. 4th 1185, 1189 (2009). The court refused to

---

[5] Other courts in this district have analyzed this issue in different ways. *See Bernal v. Sw. & Pac. Specialty Fin., Inc.*, No. 12-CV-05797-SBA, 2014 U.S. Dist. LEXIS 63338, at *14 (enforcing Rule R-7(a) in an online loan agreement); *Crook v. Wyndham Vacation Ownership, Inc.*, No. 13-CV-03669-WHO, 2013 U.S. Dist. LEXIS 160705, at *4, 16 (N.D. Cal. Nov. 8, 2013) (same, in a time share agreement); *Kimble v. Rhodes Coll., Inc.*, No. 10-CV-05786-EMC, 2011 U.S. Dist. LEXIS 59628, at *7-8 (N.D. Cal. June 2, 2011) (same, in a college enrollment agreement).

20

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    enforce the delegation provision because the agreement merely incorporated "the *possibility* of a

2    *future* rule by reference."  *Id.* at 1193-94.  Thus, courts have recognized that a plain recitation of

3    the AAA rules does not always suffice to delegate arbitrability, even between relatively

4    sophisticated parties.

5            Returning to the facts here, 23andMe's arbitration provision does not amount to clear and

6    unmistakable evidence of delegation.  The agreement states only that "[a]ny Disputes shall be

7    resolved by final and binding arbitration under the rules and auspices of the American Arbitration

8    Association."  TOS § 28b.  As explained above, 23andMe's website provided minimal notice of the

9    TOS to customers.  Critically, the arbitration provision contains no express delegation language,

10   and its mention of the "rules and auspices" of the AAA creates multiple ambiguities about which

11   rules ultimately apply.  This language forces a customer to comprehend the import of the "rules

12   and auspices" of the AAA; locate those rules independently; determine that the AAA's

13   Commercial Rules apply by operation of Rule R-1(a); and then specifically identify Rule R-7(a) to

14   learn of the delegation provision.  The possibility that the Consumer Rules might also apply creates

15   an additional ambiguity.  The problem is further compounded by the fact that the TOS purport to

16   bind users who are never asked to view the TOS and click "I ACCEPT."  For example, as noted

17   above, the TOS purport also to bind users who merely visit 23andMe's website even if the user

18   lacks an account.  *See* TOS §§ 1, 2, (states that users accept by "actually using the Services," and

19   defining "Services" to include use of the website "regardless if the use is in connection with an

20   account or not").

21           If it wanted to avoid any doubt about delegation, 23andMe certainly could have included

22   explicit delegation language, or simply reproduced or cited Rule R-7(a).  For example, in *Rent-A-*

23   *Center*, the disputed arbitration agreement had an express delegation clause that stated: "'[t]he

24   Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to

25   resolve any dispute relating to the interpretation, applicability, enforceability or formation of this

26   Agreement including, but not limited to any claim that all or any part of this Agreement is void or

27   voidable.'"  561 U.S. at 66.  Although case law holds in the commercial context that express

28   language is not required for the AAA's delegation rules to take effect, *Oracle* declined to extend

21

1    this result to consumers.  23andMe's arbitration provision does not refer to Rule R-7(a), or even a

2    specific version of the Commercial Rules (as opposed to numerous other AAA rulesets).  *See*

3    *Moody*, 2014 U.S. Dist. LEXIS 31440, at *10 (finding no delegation even where agreement

4    referred to "then current commercial" rules).  Therefore, nothing puts consumers on notice that

5    such a vague reference in the arbitration provision demonstrates their "clear and unmistakable"

6    intent to delegate arbitrability to an arbitrator.

7          Some jurisdictions have held that incorporation of the AAA rules in a consumer arbitration

8    agreement satisfies the "clear and unmistakable" test for a delegation provision.  In *Fallo v. High-*

9    *Tech Institute*, students sued their for-profit vocational school, which sought to enforce an

10   arbitration agreement that incorporated the AAA Commercial Rules.  559 F.3d 874, 877 (8th Cir.

11   2009).  The Eighth Circuit held that reference to the AAA rules effectively incorporated Rule R-

12   7(a)'s delegation provision.  *Id.* at 878.  However, *Fallo* is not binding authority and was decided

13   before the Ninth Circuit's *Oracle* decision.  Moreover, in *Oracle*, the Ninth Circuit cited *Fallo*

14   when surveying authority from other Circuits; nonetheless, the Ninth Circuit declined to follow

15   *Fallo* and declined to extend the *Oracle* holding to consumers.  *See* 724 F.3d at 1074.  If the Ninth

16   Circuit had found *Fallo* dispositive in the consumer context, the Ninth Circuit would not have left

17   open the question of whether incorporation of AAA rules delegates arbitrability to an arbitrator.

18   *Id.* at 1075 n.2.

19         23andMe argues that two of this Court's previous decisions compelling arbitration of

20   arbitrability control the outcome here.  *See* Mot. at 7.  However, neither case involved consumer

21   contracts, and both pre-date *Oracle*.  In *Guidewire Software, Inc. v. Chookaszian*, this Court

22   addressed an arbitration clause in a letter agreement for a corporate board member to purchase

23   stock options, finding a delegation provision incorporated by reference.  No. 12-CV-03224-LHK,

24   2012 WL 5379589 (N.D. Cal. Oct. 31, 2012).  In reaching its holding, this Court relied exclusively

25   on precedent involving arbitration agreements in commercial contract disputes.  *See id.* at *4.  In

26   *Yahoo! Inc. v. Iversen*, this Court held that an employment agreement's reference to "the then

27   current American Arbitration Association ('AAA') National Rules for the Resolution of

28   Employment Disputes" effectively incorporated a delegation provision requiring an arbitrator to

22

1   decide arbitrability.  836 F. Supp. 2d 1007, 1009 (N.D. Cal. 2011).  *Guidewire* and *Yahoo!* did not

2   address the consumer context and were issued before the Ninth Circuit in *Oracle* explicitly left

3   open the question of whether the principle that incorporation of AAA rules "clearly and

4   unmistakably" delegates arbitrability to an arbitrator should apply to consumers.

5           For the foregoing reasons, the Court determines in this case that 23andMe's arbitration

6   provision fails to provide clear and unmistakable proof that the parties agreed to delegate

7   arbitrability.  Because the purported delegation provision is ineffective, the Court need not reach

8   the parties' remaining arguments regarding the delegation provision.  Accordingly, the Court must

9   decide questions of arbitrability.

### 3.    Unconscionability

11          Plaintiffs' remaining defense to arbitration is that the arbitration provision is

12   unconscionable under California law.  *See* Opp'n at 18-24.  As explained above, California

13   contract law governs such defenses to arbitration agreements.[6]  "[T]he core concern of

14   unconscionability doctrine is the absence of meaningful choice on the part of one of the parties

15   together with contract terms which are unreasonably favorable to the other party."  *Sonic-*

16   *Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1145 (2013) (quotations and citations omitted).

17   "[T]he party opposing arbitration bears the burden of proving any defense, such as unconscion-

18   ability."  *Pinnacle Museum Tower Ass'n v. Pinnacle Market Dev. (US), LLC*, 55 Cal. 4th 223, 236

19   (2012).  For unconscionability, California requires a showing of both procedural and substantive

20   unconscionability, balanced on a sliding scale.  *See Patterson*, 14 Cal. App. 4th at 1664 (noting

21   analytical approaches to unconscionability).  The Court examines both prongs of unconscionability

22   and determines that overall, the arbitration provision is not unconscionable.

23          As an initial matter, 23andMe claims that any TOS provisions outside the arbitration

24   provision are irrelevant to unconscionability because they are not part of the arbitration provision

25   itself.  *See* Reply at 6; Mot. at 10.  The Supreme Court has held that "unless the challenge is to the

26   arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first

27

28   ---
[6]      There are multiple cases pending before the California Supreme Court that may affect
California's law on enforceability of arbitration agreements.  *See Tiri*, 226 Cal. App. 4th at 243 n.6.

Case No.: 13-CV-05682-LHK
ORDER GRANTING OMNIBUS MOTION TO COMPEL ARBITRATION

United States District Court
For the Northern District of California

instance." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006); *see also Rent-A-Center*, 561 U.S. at 71 ("we nonetheless require the basis of challenge to be directed specifically to the agreement to arbitrate before the court will intervene"). California has followed this principle, requiring "a focused challenge to the arbitration provision." *Phillips v. Sprint PCS*, 209 Cal. App. 4th 758, 774 (2012). Accordingly, the Court considers only arguments that apply to the arbitration provision.

a.      **Procedural Unconscionability**

Plaintiffs contend that the arbitration provision is procedurally defective because it is buried at the end of the TOS, 23andMe did not provide customers a copy of the AAA rules, and the TOS give 23andMe the ability to modify the terms unilaterally. *See* Opp'n at 19-20. 23andMe disagrees, arguing that the arbitration provision "was not hidden or difficult to understand," and that customers had a choice of other DNA services. Reply at 8-10. After weighing these arguments, the Court concludes that the provision is procedurally unconscionable.

"Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion." *Armendariz*, 24 Cal. 4th at 113. An adhesive contract "signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Id.* (citation omitted). "If the contract is adhesive, the court must then determine whether other factors are present which, under established legal rules—legislative or judicial—operate to render it unenforceable." *Id.* (quotation and citation omitted). California courts also examine the factors of "surprise" and "oppression." "The procedural element of unconscionability . . . focuses on two factors: oppression and surprise. Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice. Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." *Tiri*, 226 Cal. App. 4th at 245 (quotations and citations omitted); *see also id.* at 245 n.8 (noting interplay of adhesion and unconscionability).

Under California law, 23andMe's arbitration provision is procedurally unconscionable. As explained above, 23andMe's website provides minimal notice of the TOS to customers. Under the

24

**United States District Court**
For the Northern District of California

1    TOS, the arbitration provision supposedly binds any user who visits 23andMe's website or

2    purchases a DNA kit—even though the website does not require those users to acknowledge the

3    TOS.  Customers who purchase DNA kits have only a 60-minute window to cancel their orders and

4    receive a full refund.  By the time those customers create accounts and register their DNA kits—

5    when 23andMe first requires them to acknowledge the arbitration provision—they have already

6    paid 23andMe, and the cancellation period may have long expired.  Furthermore, even if customers

7    locate and click a hyperlink to the TOS, they must hunt for the arbitration provision because the

8    terms appear at the very end of the TOS as a subparagraph to the final section titled

9    "Miscellaneous."  *See* TOS § 28.  A customer who notices the provision's reference to the "rules

10   and auspices of the American Arbitration Association" must still determine the scope of the

11   provision by searching for those rules, ascertain that the Commercial Rules apply, determine that

12   the Consumer Rules may or may not apply (depending on the AAA's discretion), and identify any

13   objectionable provisions.  This opaque arrangement undermines 23andMe's characterization of the

14   arbitration provision as "not hidden or difficult to understand."

15        These facts render the arbitration provision procedurally unconscionable.  The arbitration

16   provision is a contract of adhesion because it is a standardized clause drafted by 23andMe (who has

17   superior bargaining strength relative to consumers) and presented as a take-it-or-leave-it

18   agreement, giving consumers no opportunity to negotiate any terms.  *See Gutierrez v. Autowest,*

19   *Inc.*, 114 Cal. App. 4th 77, 89 (2003) (finding similar terms in consumer car leases indicative of

20   adhesion).  The arbitration provision also involves substantial surprise and oppression.  Customers

21   received minimal notice of the arbitration provision, and only after handing over their money.

22   Where an arbitration provision is part of a larger contract, California courts have relied on the

23   degree of notice surrounding the contract to assess the procedural unconscionability of the

24   arbitration provision.  *E.g.*, *Ajamian*, 203 Cal. App. 4th at 796 ("The finding that the arbitration

25   provision was part of a nonnegotiated employment agreement establishes, *by itself*, some degree of

26   procedural unconscionability." (emphasis added)).

27        23andMe's arguments are unconvincing.  23andMe contends that the arbitration provision

28   cannot be procedurally unconscionable because the named Plaintiffs actually agreed to the TOS.

Case No.: 13-CV-05682-LHK
ORDER GRANTING OMNIBUS MOTION TO COMPEL ARBITRATION

United States District Court
For the Northern District of California

1    *See* Reply at 8-9.  This conflates the requirements for contract formation with the question of

2    unconscionability.  "A contract term may be held to be unconscionable even if the weaker party

3    knowingly agreed to it."  *Bruni v. Didion*, 160 Cal. App. 4th 1272, 1289 (2008) (overruled on other

4    grounds).  If 23andMe were correct that notice is "legally irrelevant" to procedural unconscion-

5    ability when the customer in fact agrees (Reply at 8), then no disputed agreement could ever be

6    procedurally unconscionable.  Next, 23andMe claims Plaintiffs "had meaningful market

7    alternatives" because there are other DNA testing services.  *Id.* at 8 & n.11.  However, the court in

8    *Gutierrez* rejected a similar argument that "alternative sources of vehicles were available" because

9    "no evidence was introduced below that other dealers offered automobile lease contracts *without*

10   *similar arbitration provisions*."  114 Cal. App. 4th at 89 n.8 (emphasis added); *see also Dean*

11   *Witter Reynolds v. Sup. Ct.*, 211 Cal. App. 3d 758, 772 (1989) (referring to "reasonably available

12   alternative sources of supply from which to obtain the desired goods and services *free of the terms*

13   *claimed to be unconscionable*" (emphasis added)).  23andMe has not shown that the available

14   alternative services did not also mandate arbitration.

15        The parties' remaining arguments provide little guidance here.  Plaintiffs claim that

16   23andMe's failure to provide the AAA rules contributes to procedural unconscionability.  *See*

17   Opp'n at 20.  However, California courts are divided on this issue.  *See Lane v. Francis Capital*

18   *Mgmt. LLC*, 224 Cal. App. 4th 676, 690-92 (2014) (collecting cases); *Tiri*, 226 Cal. App. 4th at 246

19   n.9 (declining to resolve "whether the failure to attach the AAA rules supports a finding of

20   procedural unconscionability").  Plaintiffs also note that Sections 26 and 28h of the TOS allow

21   23andMe to unilaterally modify the arbitration provision.  *See* Opp'n at 20.  Because those

22   provisions are not specific to arbitration, an arbitrator should address them.  *See Phillips*, 209 Cal.

23   App. 4th at 774.  Even setting aside these arguments, the Court concludes that the arbitration

24   provision was procedurally unconscionable.

### b.    Substantive Unconscionability

26        The arbitration provision must also be substantively unconscionable to be deemed

27   unenforceable.  Substantive unconscionability arises when a provision is so "overly harsh or one-

28   sided" that it falls outside the "reasonable expectations" of the non-drafting party.  *See Gutierrez*,

26

114 Cal. App. 4th at 88 (quoting *Armendariz*, 24 Cal. 4th at 113-14).  It is not enough that the terms are slightly one-sided or confer more benefits on a particular party; a substantively unconscionable term must be so unreasonable and one-sided as to "shock the conscience."  *Am. Software, Inc. v. Ali*, 46 Cal. App. 4th 1386, 1391 (1996); *see also Malone v. Sup. Ct.*, No. B253891, 2014 Cal. App. LEXIS 524, at *13-14 (June 17, 2014).  The Court finds that, although Plaintiffs have established substantial procedural unconscionability, the terms of the arbitration provision as a whole are not substantively unconscionable.

Plaintiffs focus on five arguments: the choice of 23andMe's headquarters (San Francisco) as the arbitration forum; a carve out for any claims by 23andMe, including intellectual property claims; a shortened statute of limitations; 23andMe's right to alter or terminate the arbitration provision without consent or notice; and limitations on the legal remedies available to consumers. *See* Opp'n at 22-23.  The Court addresses these in turn and finds that the terms are not so unduly harsh or one-sided that they are substantively unconscionable.

**Forum selection:** The Court disagrees with Plaintiffs' argument that the choice of San Francisco, California places too heavy a burden on consumers.  The Ninth Circuit has held that requiring arbitration "at the location of a defendant's principal place of business" is "presumptively enforceable."  *Polimaster Ltd. v. RAE Sys., Inc.*, 623 F.3d 832, 837 (9th Cir. 2010).  California courts have also held that a forum selection clause should be given effect so long as the choice is reasonable and has "some logical nexus to one of the parties or the dispute."  *Am. Online, Inc. v. Sup. Ct.*, 90 Cal. App. 4th 1, 11-12 (2001) (confirming that "California favors contractual forum selection clauses so long as they are entered into freely and voluntarily, and their enforcement would not be unreasonable"); *see also Intershop Commc'ns, AG v. Sup. Ct.*, 104 Cal. App. 4th 191, 196 (2002).  Here, 23andMe is headquartered in Northern California.  Although Plaintiffs are a dispersed putative class from across the country who purchased PGS online, they have failed to prove that arbitrating in San Francisco "will be so gravely difficult and inconvenient that the resisting party will for all practical purposes be deprived of his day in court."  *Mitsubishi*, 473 U.S. at 632.  Forum selection clauses are ubiquitous in online contracts and have the economic benefits of "favoring both merchants and consumers, including reduction in the costs of goods and services

Case No.: 13-CV-05682-LHK
ORDER GRANTING OMNIBUS MOTION TO COMPEL ARBITRATION

and the stimulation of e-commerce." *Am. Online*, 90 Cal. App. 4th at 12.  Additionally, Plaintiffs filed six of the nine related cases in California and voluntarily transferred all cases to San Jose, California.  Other plaintiffs with similar claims initiated three arbitration proceedings with the AAA in San Francisco.  The fact that numerous plaintiffs chose to assert their claims in Northern California suggests that the stated forum is not overly burdensome or unreasonable.

Plaintiffs rely on *Comb v. PayPal Inc.* to contest the forum-selection clause.  218 F. Supp. 2d at 1177.  *PayPal* involved a substantively unconscionable contract that mandated arbitration in Santa Clara County, California.  However, the court cited forum selection as only one among multiple factors that contributed to substantive unconscionability (including the inability of customers to join or consolidate their claims, which is not at issue here), while acknowledging that "forum selection clauses generally are presumed *prima facie* valid" under California law.  *Id.*  The plaintiffs there also presented specific information regarding the costs of arbitration.  *See id.* at 1176.  In this case, given the presumption that forum selection clauses are enforceable, the reality that multiple claims may require arbitration in a common location, and the lack of specific evidence regarding Plaintiffs' likely costs of arbitrating in San Francisco (particularly relative to the costs of litigating in federal court in San Jose), the Court cannot say that San Francisco lacks any "logical nexus to one of the parties or the dispute." *Am. Online*, 90 Cal. App. 4th at 12; *see also King v. Hausfeld*, No. 13-CV-00237-EMC, 2013 WL 1435288, at *15 (N.D. Cal. Apr. 9, 2013) ("Given the location of the firm's headquarters, there is a rational basis for selecting a Washington, D.C. forum.").

**Restrictions on claims:** Plaintiffs' second assertion—that the arbitration restrictions do not apply to any claims by 23andMe—is unavailing.  Plaintiffs posit that the phrase "any disputes *with* 23andMe" includes only claims *against* 23andMe, so that 23andMe's affirmative claims are not subject to arbitration.  This argument is baseless.  The arbitration provision plainly applies equally to both parties, and 23andMe does not take the position that this clause is a one-way street.  *See, e.g.*, *Bigler v. Harker Sch.*, 213 Cal. App. 4th 727, 737-38 (2013) (rejecting argument that "'any dispute involving the School'" was a nonmutual restriction).  Contrary to Plaintiffs' contention, the arbitration provision is distinguishable from the improper agreement in *Armendariz* that exempted

28

claims by an employer.  *See* 24 Cal. 4th at 92, 120 ("I agree as a condition of my employment, that in the event my employment is terminated, and *I* contend that such termination was wrongful . . . ." (emphasis added)).  Plaintiffs also argue that the exclusion for intellectual property disputes ("Except for any disputes relating to intellectual property disputes") unfairly favors 23andMe.  As explained above, the TOS allows consumers to retain certain intellectual property rights to their genetic and self-reported information.  *See* TOS §§ 9, 13.  Therefore, consumers may avail themselves of the carve out for intellectual property disputes.

**Limitations period and unilateral modification:** Plaintiffs' third and fourth arguments depend on contract provisions outside the arbitration provision: the one-year limitations period (TOS § 28d), and 23andMe's ability to "modify, supplement or replace" the terms unilaterally (TOS §§ 26, 28h).  However, these provisions are separate from the arbitration provision, and Plaintiffs have not shown how those clauses specifically render the arbitration provision substantively unconscionable.  *See Buckeye*, 546 U.S. at 445-46; *Phillips*, 209 Cal. App. 4th at 774.

**Fees and costs:** Finally, Plaintiffs argue that the agreement unfairly restricts consumers' available remedies because of a fee-shifting provision.  *See* TOS § 28b ("with arbitration costs and reasonable documented attorneys' costs of both parties to be borne by the party that ultimately loses").  Plaintiffs argue that this "loser pays" provision disproportionately affects Plaintiffs' costs of arbitration.  However, 23andMe represents that it has formally waived any right to recover attorneys' fees and costs at the request of the AAA.  *See* Reply at 11.[7]  Accordingly, the Court declines to consider whether or not this provision is substantively unconscionable.

The Court has considered the parties' remaining arguments and identifies no additional basis for substantive unconscionability.  Plaintiffs challenge the costs of arbitration and the fairness of AAA discovery rules.  *See* Opp'n at 21; Reply at 11-12.  For purposes of this motion, the Court accepts Plaintiffs' assertion that the filing fee is $975 under the AAA Commercial Rules.  However, Plaintiffs fail to show that this fee "shocks the conscience," particularly relative to

---

[7]     A district court has found that as long as fee-shifting provisions apply equally to both parties, as is the case here, the term is enforceable.  *See King*, 2013 WL 1435288, at *18 ("[T]he point of a fee shifting clause is that if Plaintiff's claim proves meritorious, *his* fees would be reimbursed by Defendant. The clause could thus facilitate his ability to vindicate his rights." (emphasis in original)).

29

Case No.: 13-CV-05682-LHK
ORDER GRANTING OMNIBUS MOTION TO COMPEL ARBITRATION

1    litigation expenses.  Rather, Plaintiffs rely on cases where arbitration fees were orders of

2    magnitude higher.  *See Gutierrez*, 114 Cal. App. 4th at 89-91 (administrative fee of $8,000

3    exceeded plaintiffs' ability to pay); *Parada*, 176 Cal. App. 4th at 1581 ("To arbitrate a claim, each

4    party thus would have to pay at least $20,800, and would have to deposit that amount before the

5    arbitration hearing.").  Plaintiffs also fail to show that any discovery limitations would impose a

6    great hardship here.  *See Coast Plaza Doctors Hosp. v. Blue Cross of Cal.*, 83 Cal. App. 4th 677,

7    689 (2000) ("We are not aware of any case that has ever held that an arbitration provision is

8    substantially unconscionable merely because a party's discovery rights are limited in arbitration.").

9    Additionally, Plaintiffs suggest that the delegation provision incorporated from Rule R-7(a) is

10   substantively unconscionable under California law.  *See* Opp'n at 7-8.  Plaintiffs rely on two

11   California cases that rejected arbitration agreements as unconscionable to the extent they purported

12   to delegate arbitrability via incorporation of the AAA rules.  *See Murphy v. Check 'N Go of Cal.,*

13   *Inc.*, 156 Cal. App. 4th 138, 145 (2007); *Ontiveros v. DHL Express (USA), Inc.*, 164 Cal. App. 4th

14   494, 508 (2008).  To the extent Plaintiffs contend that the delegation provision contributes to the

15   unconscionability of the entire arbitration provision, those arguments are misplaced.  The

16   California Court of Appeal has recently acknowledged that intervening Supreme Court precedent

17   has overruled *Murphy* and *Ontiveros*.  *See Tiri*, 226 Cal. App. 4th at 248-49; *Malone*, 2014 Cal.

18   App. LEXIS 524, at *32-33.

19        For these reasons, the Court concludes that the arbitration provision is not substantively

20   unconscionable.  Therefore, while the arbitration provision is procedurally defective, Plaintiffs

21   have not met their burden to demonstrate that the provision is both procedurally and substantively

22   unconscionable, as California law requires.  Accordingly, the Court enforces the arbitration

23   provision and grants 23andMe's motion.

24        **C.    Stay or Dismiss**

25        When arbitration is mandatory, courts have discretion to stay the case under 9 U.S.C. § 3 or

26   dismiss the litigation entirely.  *See Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 638 (9th Cir.

27   1988); *see also Hopkins & Carley, ALC v. Thomson Elite*, No. 10-CV-05806-LHK, 2011 U.S. Dist.

28   LEXIS 38396, at *28 (N.D. Cal. Apr. 6, 2011) ("Where an arbitration clause is broad enough to

30

Case No.: 13-CV-05682-LHK
ORDER GRANTING OMNIBUS MOTION TO COMPEL ARBITRATION

United States District Court
For the Northern District of California

1  cover all of a plaintiff's claims, the court may compel arbitration and dismiss the action.").

2  23andMe has requested dismissal of all claims and does not object to Plaintiffs joining the existing

3  arbitration proceedings.  *See* Mot. at 11-12.  Plaintiffs are silent as to whether a stay or dismissal

4  would be appropriate.

5         This Court has previously stayed litigation pending arbitration—instead of dismissing—by

6  agreement of the parties in light of potential concerns about statutes of limitation.  *Hopkins &*

7  *Carley*, 2011 U.S. Dist. LEXIS 38396, at *28-29.  Because the parties have identified no such

8  concerns here, and dismissal would render this decision immediately appealable (*see MediVas,*

9  *LLC v. Marubeni Corp.*, 741 F.3d 4, 7 (9th Cir. 2014) ("[A]n order compelling arbitration may be

10  appealed if the district court dismisses all the underlying claims, but may not be appealed if the

11  court stays the action pending arbitration.")), the Court concludes that dismissal is appropriate.

**IV.     CONCLUSION**

13         For the foregoing reasons, the Court GRANTS Defendant's Motion to Compel Arbitration

14  and dismisses all claims without prejudice.  The Clerk shall close the following case files: Nos.

15  5:13-CV-05682-LHK, 5:14-CV-00294-LHK, 5:14-CV-00429-LHK, 5:14-CV-01167-LHK, 5:14-

16  CV-01191-LHK, 5:14-CV-01258-LHK, 5:14-CV-01348-LHK, and 5:14-CV-01455-LHK.

**IT IS SO ORDERED.**

18  Dated: June 25, 2014                    _____

                                           LUCY H. KOH
                                           United States District Judge

Case No.: 13-CV-05682-LHK
ORDER GRANTING OMNIBUS MOTION TO COMPEL ARBITRATION